JOHN K. WEARE, and others, *vs.* JOSIAH CHASE, and others.

York.    Opinion November 28, 1899.

*Waters. Obstruction. Prescription. Damages.*

In an action between upper and lower riparian proprietors upon the same stream, the plaintiffs being the lower proprietors and the defendants the upper proprietors, the plaintiffs claimed that the defendants "unlawfully, unnecessarily and wilfully" managed the gates at the foot of Chase's Pond, which empties into the stream in question, in such manner as to obstruct the natural flow of the water in the stream to the injury of the plaintiffs. They also claimed that they themselves had the right by prescription, or contract, to control these gates, and that the defendants unlawfully interfered with the exercise of this right.

*Held;* that the plaintiffs had no right to control the gates at the foot of Chase's Pond; and that there was no right by prescription, because the prior use of the gates by the defendants' predecessors, from which prescription is claimed, was mutually and equally beneficial to the plaintiffs, as well as the defendants. *Also;* that there was no such right by contract, because an easement or permanent right in a dam or watercourse cannot be acquired by parol agreement.

*Also;* that the plaintiffs are entitled to the reasonable use and enjoyment of the water in the stream and to the natural flow thereof, without obstruction and without diminution, subject only to the reasonable and proper use or detention by the proprietors above. They are not entitled to an intermittent flow, such as might be created by using Chase's Pond as a reservoir, though such a flow might be more useful.

The defendants did not show that they had any beneficial use for the waters in the pond, and admitted that on several occasions they let the waters out of the pond in order to be able to make repairs upon the dam at its foot, and after completion of the repairs closed the gates and allowed the pond to refill. *Held;* that this was an obstruction of the natural flow, and unless justified, gives the plaintiffs a right to recover the damages sustained thereby.

*Held;* that the facts shown by the defendants are not a justification; and that, therefore, the verdict, so far as it establishes the liability of the defendants, should not be disturbed. But the damages awarded are manifestly excessive.

The plaintiffs are entitled to recover damages for the obstruction or detention of the natural flow only, the same flow they would have been entitled to, if there had been no pond, no dam and no gates. *Held;* that the comparison, evidently adopted by the jury, between the flow in 1883, and the flow during the years for which damages are claimed, is an unfair test, for in 1883 the plaintiffs were getting the benefit of an intermittent flow, which was more useful and more than they could legally exact.

ON MOTION BY DEFENDANTS.

This was an action to recover damages for obstructing and detaining water from the plaintiffs' mill on Cape Neddick river, in the town of York, from the first day of January, 1891, to the spring of 1896.

The plaintiffs alleged that during the period complained of, the defendants obstructed and impeded the natural flow of water, by raising the gates and draining the pond in the fall, then shutting them down and keeping them closed until the spring rains, then raising them and draining the pond and, when the pond was empty, keeping them closed until the fall.

The jury returned a verdict of $3,486.00, and the case came before the law court on a motion for a new trial as against evidence and because the damages are excessive.

The facts are stated in the opinion.

*J. C. Stewart, B. F. Hamilton* and *B. F. Cleaves,* for plaintiffs.

Counsel cited: *Phillips* v. *Sherman,* 64 Maine, p. 173; *Barnard* v. *Shirley,* 151 Ind. Superior Court, 160, (S. C. 41 L. R. A.

737, and note); *Clark* v. *Rockland Water Power Co.*, 52 Maine, p. 78; *Pillsbury* v. *Moore*, 44 Maine, 154; *Lancey* v. *Clifford*, 54 Maine, p. 490; *Lockwood Co.* v. *Lawrence*, 77 Maine, 297, p. 320; *Crosby* v. *Bessey*, 49 Maine, 539; *Donnell* v. *Clark*, 19 Maine, 174; Gould on Waters, § 346; *Lawrence* v. *Fairhaven*, 5 Gray, 110; *Davis* v. *Winslow*, 51 Maine, p. 292, 293.

*Geo. F. and Leroy Haley*, for defendants.

SITTING: EMERY, HASKELL, WISWELL, STROUT, SAVAGE, FOGLER, JJ.

SAVAGE, J. The plaintiffs allege, in substance, that they are the owners and operators of a mill privilege and saw-mill on Cape Neddick River in York, and as such, during the six years prior to the date of their writ, December 21, 1896, were entitled to the natural flow of the water from Chase's Pond, down the river, to and past their mill and privilege; that the defendants during that period owned and controlled certain dams and gates at the outlet of Chase's Pond; that the defendants, in each of the six years, "unlawfully, unnecessarily and wilfully," raised the gates to the dam at the foot of the pond, and permitted large quantities of water to run out, and afterwards in each year, "unlawfully, unnecessarily and wilfully" closed the gates, and so obstructed the flow of water, or retained it, that none came from the pond, down the river, to their mill, during certain months in each year; and that, by reason of the alleged unlawful acts of the defendants, the plaintiffs were deprived of the use of their mill and privilege. It is also alleged that the plaintiffs, by contract with the defendants' predecessor in title, acquired the right to the exclusive control of the dam and gates at the outlet of Chase's Pond, "in regard to the supply from the pond of the natural flow of the waters thereof down the river to and past plaintiffs' mill and privilege, for the purpose of supplying power therefor." It is not alleged that the defendants' dam and gates at the foot of the pond are of themselves an unlawful obstruction to the flow of the water from the pond. The complaint of the plaintiffs goes rather to the manner in which

the defendants have managed and operated the dam and gates, and to the refusal of the defendants to permit the plaintiffs to manage and operate them, as they claim they have a right to do, by contract. And furthermore, it is not claimed that injury was done by an overflow of water, caused by unlawfully opening the dam or gates, but rather by retaining the water at times and under circumstances when the plaintiffs say they were entitled to it.

The case presents a controversy between upper and lower riparian proprietors upon the same stream, the plaintiffs being the lower proprietors and the defendants the upper proprietors. The following facts may be regarded as established by the evidence: The respective mill privileges of the parties are about a mile and a half apart, on Cape Neddick River. Both parties show title by mesne conveyances from the town of York, the plaintiffs by grant in 1736, the defendants by grant in 1702. It does not appear when dams were first erected or mills first built upon either privilege. In 1841, there was a saw-mill, a grist-mill and a fulling-mill at the plaintiffs' privilege; at the same time there was a grist-mill and a fulling-mill at the defendants' privilege. The plaintiffs' privilege has been used for mill purposes all of the time since 1841 to the present time. At the defendants' privilege, a woolen factory was erected in 1845, in place of the fulling-mill; and in 1866, the grist-mill was abandoned. Up to 1866, the mills on defendants' mill privilege were operated by power created by a dam at the foot of a small pond below Chase's Pond. And during all the time from 1841 to 1866, Chase's Pond was used solely as a storage or reservoir pond. At its outlet there was a dam owned and controlled by the predecessors of the defendants. Over this dam, or through its gates, water fell directly into the small pond which furnished power to the mills on defendants' privilege. In 1866, the dam at the foot of the little pond was abandoned, and power was supplied to the woolen mill there by water conducted through a penstock running from the gate in the dam at the foot of Chase's Pond directly to the mill wheels. So it remained until 1881, when the woolen factory was burned. Since that time there has been no mill of any kind on defendants' privi-

lege or at the foot of Chase's Pond. Nor did the defendants make any beneficial or profitable use of the water stored by the dam, until the spring of 1896, when, in some way not disclosed by the evidence, the York Shore Water Company came into possession of the dam and used the stored waters of Chase's Pond.

Down to 1881, the defendants' predecessors controlled the stored waters in Chase's Pond, by raising and lowering the gates to suit their own convenience. It is in evidence that during most seasons of the year, by opening the gates at the foot of Chase's Pond in the morning and closing them at night, that pond would fill up at night substantially what it had lost during the day. In this way the mills on defendants' privilege were operated a large portion of the time, except in seasons of drought. But it is evident that by the management of the dam and gates in the manner we have described, the mills on plaintiffs' privilege were equally benefited. They got the use of the stored water after it had been used by defendants' mill, and they got it during the same seasons and for the same length of time, and were thereby enabled to make a profitable use of their mill for a longer time during each year than they otherwise could have done.

After defendants' woolen mill was burned in 1881, the plaintiffs were permitted by the defendants, for several years, to control the waters to suit themselves, and thus far no complaint is made. From and after 1885, the defendants resumed exclusive control of the dam and gates, and it is claimed by the plaintiffs that they arbitrarily, capriciously and wantonly, opened the gates and permitted pondfuls of water to escape, and then closed them and permitted no water to run until the pond filled, during which periods of days or even months elapsed.

The defendants admit that they sometimes raised the gates in freshet times, for the sake of safety, but say that they closed them as soon as the danger was over. They also admit that they drained the pond, on several occasions, for the purpose of rebuilding or repairing the dam, and then left the gates shut until the pond filled. Otherwise, they say that they have not meddled with the gates, except when requested by the plaintiffs.

At the outset, we may say that the plaintiffs fail to show any right in themselves to control or manage the dam or gates at Chase's Pond, either by prescription or contract. Such an easement will not arise by prescription in favor of the plaintiffs and against the defendants, in a case like this, where the defendants exercised the sole control and management, and where the use was mutual and equally beneficial to both parties. Nor is there any evidence of a valid contract by which the plaintiffs would be entitled to control and manage the dam and stored waters. The plaintiffs introduced testimony to the effect that after the woolen mill was burned and prior to 1885, the then owner of the dam agreed that the plaintiffs might manage and control the waters if they would make the necessary repairs. This was denied by the defendants. But assuming it to be true, it only tends to prove an oral license, temporary and revocable. No easement or permanent right in a dam or watercourse can be acquired by parol agreement. *Pitman* v. *Poor*, 38 Maine, 237; *Moulton* v. *Faught*, 41 Maine, 298; *Cook* v. *Stearns*, 11 Mass. 533. And not only was there no binding contract or grant in this case, but the conduct of the parties shows that they did not so understand it. The control which the plaintiffs exercised between 1881 and 1885 was, we think, understood to be permissive only.

The plaintiffs, therefore, as lower riparian proprietors, were entitled to the reasonable use and enjoyment of the water in Cape Neddick River, and to the natural flow of the stream, without obstruction and without diminution, subject only to the reasonable and proper use or detention by the proprietors above. *Phillips* v. *Sherman*, 64 Maine, 171. But it should be observed that they were entitled only to the natural flow, not to an intermittent flow. *Hamor* v. *Bar Harbor Water Company*, 92 Maine, 364. It is true, that improvements made by the proprietor above inure to the benefit of those below. If by such improvements the lower proprietor gets a more useful flow than the natural flow would be, he is entitled to it. But he is not entitled to stored waters as such; nor has he the right to let them down intermittently and irregularly, to suit his own convenience. And this is true, whether

there be a dam or not, for the natural flow is presumptively the same with a dam as without a dam; no more, no less. *Hamor* v. *Bar Harbor Water Company*, supra.

The defendants admit that they interrupted the natural flow from the pond; that having drained the pond on several occasions, they closed the gates and thereby stopped the flow, and they claim that such detention was reasonable and necessary. Were they justified? It is undoubtedly the law not only that the upper riparian proprietor has the right to the use of the waters as they pass over his land, but that a mill owner may under some circumstances detain the waters for a reasonable time and to a reasonable extent. Gould on Waters, § 218.

It is unnecessary, however, to discuss this feature further. The defendants were not mill owners at the times complained of, nor had they, so far as appears, any beneficial use for the waters. Nor are we called upon to decide whether the defendants had a right to continue their dam or repair it after their mills were burned when they no longer had any use for the power created by the dam.

As the plaintiffs in their writ make no complaint of the existence or maintenance of the dam, we may assume that the defendants, by grant, prescription or otherwise, had a right to maintain it there, although they have had no mill since 1881. But even as dam owners, and having the right to maintain and repair their dam, the defendants could not wantonly, or capriciously or unnecessarily, detain the waters, without becoming liable to those injured thereby. If they did so, the plaintiffs, if injured, are entitled to recover damages for such detention; for the defendants, so far as they undertook to manage or control the flow of the water, were limited to a reasonable use or detention. So, if the defendants rebuilt or repaired the dam when not reasonably necessary, or at an improper season, or in an improper manner, and thereby the natural flow was detained to the injury of the plaintiffs, the plaintiffs are entitled to a remedy.

And if water was detained by the process of building or repairing, was it necessary or was it reasonable? Now, the defendants admit that when the repairs were completed and the dam made

tight, they closed the gates. Thus, from that time on, at least, they clearly obstructed the natural flow. Was this reasonable? We think not. The defendants had no beneficial use for the waters stored. They had no mill. One of them testifies that the object in keeping up the dam was to have water in the pond in summer time, for personal pleasure, and "to maintain our right to the water," our right "to maintain a dam." Surely such reasons do not justify shutting off the natural flow from the mill owners below. Such rights as the defendants had should have been exercised with reference to the surrounding conditions, to the size and character of the stream, and the uses which the plaintiffs were entitled to make of the water. When the defendants completed their repairs, under such circumstances, they should have allowed the natural flow to proceed from that time on. The pond would easily have filled at freshet periods, had it been necessary that it should be filled. The defendants seemed to assume that they had a right to do with the dam and waters as they pleased. In that they were in error. In fact, their learned counsel now makes no such claim.

The justification offered by the defendants therefore fails. The result is the same in this case, whether the defendants had no right to do the acts complained of, or whether they did them in an unreasonable manner. The latter is what is complained of by the plaintiffs, and their contention is sustained upon the defendants' own showing.

For these reasons, we think the verdict establishing the liability of the defendants should not in so far be disturbed. But the damages are manifestly excessive. The plaintiffs arrive at the amount which they claim by comparing their net profits in 1883 with the net profits since the defendants intermeddled with the natural flow. In 1883, the net profits were $500, says one, $600 says the second, $666 says the third; since 1890, they have been nothing. The jury seem to have adopted substantially the plaintiffs' method of computation. The verdict was for $3486, which averages $581 for each year covered by the plaintiffs' writ. But to compare profits from 1891 to 1896, inclusive, with the profits in 1883 is not

just. It is not a fair test. In 1883, the plaintiffs, by permission of the defendants, were hoisting and lowering the gates at the dam at Chase's Pond as they pleased. They were getting better than the natural flow of the water. They were getting such an intermittent flow as enabled them to operate their mills at times when they could not otherwise have done so. They are entitled to damages only for the unreasonable obstruction to the natural flow. Moreover, the testimony for the plaintiffs shows that, during the first two years after the defendants rebuilt the dam in 1889, they got "nearly the natural flow." This period includes some portion of the six years covered by the writ. The case shows that the York Shore Water Company took possession of the dam in the spring of 1896. This also shortens the six year period.

The case must go back to be heard again in damages only. *McKay, Admr.* v. *New England Dredging Co.*, ante., p. 201.

<div align="center">

*Motion sustained.*

*Verdict set aside as to damages only.*